**2026 WI 10**

# Supreme Court of Wisconsin



STATE OF WISCONSIN,
*Petitioner-Respondent,*

*v.*

K.R.C.,
*Respondent-Appellant-Petitioner.*

No. 2023AP2102
Decided March 26, 2026

REVIEW of a decision of the Court of Appeals
Manitowoc County Circuit Court (Jerilyn M. Dietz, J.) No. 2022JV71

JANET C. PROTASIEWICZ, J., delivered the majority opinion of the Court, in which JILL J. KAROFSKY, C.J., REBECCA FRANK DALLET, and SUSAN M. CRAWFORD, JJ., joined. BRIAN K. HAGEDORN, J., filed a concurring opinion, in which ANNETTE KINGSLAND ZIEGLER and REBECCA GRASSL BRADLEY, JJ., joined.

¶1 JANET C. PROTASIEWICZ, J. Kevin—a pseudonym for K.R.C.—was 12 years old when a classmate reported that Kevin had touched him in the groin. The next day, police questioned Kevin at school in a small office used by the school resource officer.[1] One officer questioned him while a second, fully-uniformed officer stood in front of

---

[1] A school resource officer is a law enforcement officer deployed in schools. *See* WIS. STAT. § 62.90(8).

the door. They continued to question him a short while later as he sat in a school-suspension cubicle. While under interrogation, Kevin admitted that he accidentally hit the other student.

¶2    Kevin was charged with Fourth Degree Sexual Assault, and the circuit court allowed the State to use Kevin's statements at trial. The circuit court adjudicated Kevin delinquent and the court of appeals affirmed. Here, Kevin argues that his statements should have been excluded because they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and were involuntary.

¶3    We hold that Kevin was in custody for purposes of *Miranda* when he made statements to law enforcement. Because he was under custodial interrogation and was never Mirandized, his statements should have been excluded at trial. However, we hold that admitting his custodial statements was harmless error. Accordingly, we need not address whether his statements were involuntary. We affirm the court of appeals.

## I.  BACKGROUND

### A.  UNDERLYING INCIDENT AND INTERROGATION

¶4    In June 2022, Kevin was in seventh grade and 12 years old. One day at school, Kevin touched a classmate in the groin as he walked by. The classmate reported the incident to school staff and to his father, who spoke with a school administrator and eventually a school resource officer.

¶5    The next day, Kevin was removed from class for questioning.[2] The interview was in the school resource officer's office. The room was "a very small tight office . . . kind of like a closet," and it had a single door which remained closed during the interview.

¶6    Kevin sat in the office with two police officers. Both were strangers to him: one worked at another school and the other was new. One officer did the questioning. She sat across from Kevin, perhaps 10 feet

---

[2] The facts about the interrogation are undisputed and come from the testimony of the school resource officer at the suppression hearing.

away, and she wore street clothes and a vest that identified her as a police officer. The second officer was in full police uniform and was armed. He stood positioned in front of the door throughout the questioning. He did not speak. Kevin was alone in the room with the two officers for the entirety of this questioning, except for a moment when a staff member knocked on the door to see if Kevin was there.

¶7     A piece of printer paper with a handwritten message was taped to the office wall. In purple and blue marker, the paper said: "You Are in Here Voluntarily Unless Told Otherwise. You are Being Filmed And Can Leave at Any Time!" Though the piece of paper hung close to Kevin during the interview, no one acknowledged it or explained it to Kevin.

¶8     The officer questioned Kevin about touching the other student. Though the tone was conversational and some questions were open-ended, the officer told Kevin that there were witnesses, despite knowing there were none. She also asserted to Kevin that "it happened." The officer did not provide *Miranda* warnings to Kevin. She never told him that he was free to leave, that he did not need to answer questions, or that he could call his parents. The officer questioned him for approximately 10 minutes, and Kevin sat in a comfortable position and seemed to understand the conversation. At some point during the interview, Kevin said that "he accidently, possibly, hit" the other student's groin. After the questioning, the officers let Kevin leave the office, but it is not clear where he went.

¶9     Less than an hour later, the interrogation resumed. This questioning took place in the student services area, which was right outside the school resource officer's office. Kevin sat in a cubicle designated for in-school suspension. Three or four adult authority figures stood around Kevin—the two officers, an assistant principal, and perhaps another school staff member. The questions were "more direct" this time. Whereas the first interview involved asking questions to figure out what happened, this time the authority figures told Kevin what they heard happened. Though the assistant principal did much of the talking this round, one officer asked some questions and may have raised her voice with Kevin. They questioned him for two or three minutes, and Kevin once again stated that he "did it by accident." After the interrogation, Kevin remained in in-school suspension.

B. PROCEDURAL HISTORY

¶10     The State filed a delinquency petition charging Kevin with one count of Fourth Degree Sexual Assault. Kevin moved to suppress his statements to the officers, arguing that law enforcement elicited the statements in violation of *Miranda* and that his statements were involuntary. The circuit court held a suppression hearing and heard testimony from the school resource officer who questioned Kevin. In the end, the circuit court denied the suppression motion, concluding that Kevin's statements were admissible because "this was a non-custodial voluntary conversation."

¶11     With the suppression matter settled, the circuit court held a bench trial. The State set out to prove Fourth Degree Sexual Assault. *See* WIS. STAT. § 940.225(3m) (2021–22).[3] To do so, it needed to prove that Kevin had "sexual contact with a person without the consent of that person." *Id.* To prove "sexual contact," the State had to show that there was an "intentional touching" with "the purpose of sexually humiliating" the victim. § 940.225(5)(b)1.

¶12     At trial, the State called four witnesses: the victim, another classmate, the assistant principal, and the school resource officer who questioned Kevin. The victim testified that Kevin touched him on his groin with a cupped hand. The victim described that he was waiting outside of a classroom when Kevin touched him and that Kevin: angled toward the victim; intentionally stretched out his arm to make contact with the victim; was not swinging his arms or messing around; and did not say "oops" or otherwise apologize for making contact. The victim said he believed Kevin's conduct was intentional, not an accident. As a result of the contact, the victim said he felt uncomfortable. The assistant principal testified that he spoke with Kevin without law enforcement present, and Kevin admitted there was a "tap" or a "hit." The school resource officer testified that, during the interrogation, Kevin said he "might have accidently touched" the other student.

¶13     The circuit court found Kevin delinquent. Kevin appealed, arguing that his statements should have been suppressed under *Miranda*

---

[3] All subsequent references to the Wisconsin Statutes are to the 2021–22 version.

and because his statements were involuntary. The court of appeals held that there was no *Miranda* violation because Kevin was not in custody and that his statements were voluntary. *State v. K.R.C.*, No. 2023AP2102, unpublished slip op. (Wis. Ct. App. Oct. 30, 2024).

## II. ANALYSIS

¶14 We hold that Kevin was in custody when the officers interrogated him without first giving him *Miranda* warnings. Accordingly, the circuit court erred when it admitted statements Kevin made during the interrogation. Still, that error was harmless. We first address the *Miranda* custody standard, paying special attention to its application to children in school, and then we apply that standard to the facts of this case. Last, we take up the harmless error analysis.[4]

### A. *Miranda* CUSTODY

#### 1. Custody in General

¶15 To safeguard the Fifth Amendment right against self-incrimination, *Miranda* prevents prosecutors from introducing statements made by suspects under custodial interrogation unless law enforcement informed the suspect of certain now-familiar rights. U.S. CONST. amend. V; 384 U.S. at 444–45.[5] Specifically, a person under custodial interrogation "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444.

---

[4] Kevin also argued his statements were involuntary. We need not address that argument because we determine the same statements should have been excluded under *Miranda v. Arizona*, 384 U.S. 436 (1966).

[5] Kevin mentions the analogous provision of the Wisconsin Constitution—WIS. CONST. ART. I, § 8(1)—but does not develop any independent argument under that provision. Thus, we treat this as a federal constitutional claim. *See Serv. Emps. Int'l Union, Loc. 1 v. Vos*, 2020 WI 67, ¶24, 393 Wis. 2d 38, 946 N.W.2d 35 ("We do not step out of our neutral role to develop or construct arguments for parties . . . ."), *overruled on other grounds by, Evers v. Marklein*, 2025 WI 36, 417 Wis. 2d 453, 22 N.W.3d 789.

¶16    *Miranda* applies to statements "stemming from custodial interrogation." *Id.* Here, we consider the "custodial" half of "custodial interrogation," because there is no dispute that Kevin was interrogated.

¶17    When determining whether a suspect was in custody for purposes of *Miranda*, we accept the circuit court's factual findings unless they are clearly erroneous, but we review the ultimate question of custody independently. *State v. Halverson*, 2021 WI 7, ¶29, 395 Wis. 2d 385, 953 N.W.2d 847. The State bears the burden to show whether the suspect was under custodial interrogation. *State v. Armstrong*, 223 Wis. 2d 331, ¶25, 588 N.W.2d 606 (1999), *overruled on other grounds as noted by, Halverson*, 395 Wis. 2d 385, ¶21.

¶18    We use a two-pronged inquiry to determine whether a suspect is "in custody" for purposes of *Miranda*. *Halverson*, 395 Wis. 2d 385, ¶17.

¶19    First, we ask whether a reasonable person would have felt free to leave. *Id.* (citing *Howes v. Fields*, 565 U.S. 499, 509 (2012)). To do so, we consider the totality of the circumstances. *Id.* We must look at the objective circumstances, not subjective views. *Stansbury v. California*, 511 U.S. 318, 323 (1994). Relevant factors include "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Halverson*, 395 Wis. 2d 385, ¶17 (quoting *Howes*, 565 U.S. at 509). We have also said we consider "the degree of restraint; the purpose, place, and length of the interrogation; and what has been communicated by police officers." *Id.*, ¶30 (quoting *State v. Bartelt*, 2018 WI 16, ¶32, 379 Wis. 2d 588, 906 N.W.2d 684). In turn, when evaluating the "degree of restraint" we consider "whether the suspect is handcuffed, whether a weapon is drawn, whether a frisk is performed, the manner in which the suspect is restrained, whether the suspect is moved to another location, whether questioning took place in a police vehicle, and the number of officers involved." *Id.* (quoting *Bartelt*, 379 Wis. 2d 588, ¶32).

¶20    Second, we ask "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*, ¶17 (quoting *Howes*, 565 U.S. at 509).[6]

## 2. *Custody and Schools*

¶21    Many courts have applied *Miranda* in the school setting. The Supreme Court provided guidance in *J.D.B. v. North Carolina*, 564 U.S. 261 (2011), where it held that "a child's age properly informs the *Miranda* custody analysis." *Id.* at 265. In *J.D.B.*, police officers and school administrators questioned a 13-year-old seventh-grader for 30 to 45 minutes in a school conference room, without providing *Miranda* warnings. *Id.* at 266. The Court held that the age of a child is a factor in the *Miranda* custody analysis, so long as the age of the child was known or would have been objectively apparent to a reasonable officer. *Id.* at 277. It remanded for the ultimate custody determination on the facts. *Id.* at 281.

¶22    The Court's reasoning highlights the special care we must take when analyzing the interrogation of children. It is a "commonsense reality" and "beyond dispute that children will often feel bound to submit to police questioning when an adult in the same circumstances would feel free to leave." *Id.* at 264–65. And when it comes to interrogation, events that "would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens." *Id.* at 272 (quoting *Haley v. Ohio*, 332 U.S. 596, 599 (1948)). The Court also addressed the unique nature of

---

[6] The State argues that the test must include whether the situation amounts to the "functional equivalent of formal arrest." *See Berkemer v. McCarty*, 468 U.S. 420, 442 (1984); *see also State v. Dobb*s, 2020 WI 64, ¶53, 392 Wis. 2d 505, 945 N.W.2d 609. However, the Supreme Court's most recent guidance does not include that phrase. *See Howes v. Fields*, 565 U.S. 499, 509–12 (2012) (laying out the two-part test without mentioning the "functional equivalent of formal arrest"). Likewise, the Supreme Court's juvenile *Miranda*-custody case mentions that standard only in passing. *See J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011). Regardless, whether we use our second prong—inherently coercive pressures— or the standard the State points to, we think we capture the relevant inquiry. *See* Lauren E. Clatch, *Interrogating* Miranda*'s Custody Requirement*, 103 N.C. L. REV. 69, 104 (2024) ("[A]sking whether [the] interrogation environment 'presents the same inherently coercive pressures' as that in *Miranda* is not substantially different from assessing whether the environment functionally arrested the interrogee." (quoting *Howes*, 565 U.S. at 509)).

schools. A student's "presence at school is compulsory and . . . disobedience at school is cause for disciplinary action." *Id.* at 276; *see also id.* at 297 (Alito, J., dissenting) (arguing that, rather than considering age, courts should "consider[] the unique circumstances present when minors are questioned in school").

¶23 When analyzing *Miranda* custody in the school setting, courts consider factors similar to those in the adult context, but also consider factors unique to students. For example, courts have considered traditional adult-custody factors—albeit from the perspective of a child—such as: traditional indicia of arrest, like frisks and handcuffs;[7] physical restraints;[8] the length of the interrogation;[9] the location of the interrogation;[10] statements made during the interrogation;[11] and whether the student was released at the end of the interrogation.[12]

---

[7] *See, e.g., In re K.D.L.*, 700 S.E.2d 766, 772 (N.C. Ct. App. 2010) (determining a student was in custody where the student was frisked and transported in a police vehicle).

[8] *See, e.g., N.C. v. Commonwealth*, 396 S.W.3d 852, 862 (Ky. 2013) (in custody where student was in a closed-door room and was expected to stay put); *In re Tyler F.*, 755 N.W.2d 360, 368 (Neb. 2008) (no custody where there was no handcuffs or physical restraint).

[9] *See, e.g., K.D.L.*, 700 S.E.2d at 772 (in custody for six-hour questioning); *People v. N.A.S.*, 329 P.3d 285, ¶13 (Colo. 2014) (no custody for five-to-ten-minute questioning).

[10] *See, e.g., B.A. v. State*, 100 N.E.3d 225, 233 (Ind. 2018) (in custody where questioning was in the vice-principal's office); *In re M.A.K.*, 667 N.W.2d 467, 472 (Minn. Ct. App. 2003) (in custody where questioning was in a school police liaison's office); *R.D.S. v. State*, 245 S.W.3d 356, 364 (Tenn. 2008) (no custody where questioning was in a parking lot).

[11] *See, e.g., B.A.*, 100 N.E.3d at 233 (in custody where "[n]o one told [the student] that he was free to call his mother, leave the room, take a break, or go to class"); *In re Tyler F.*, 755 N.W.2d at 368 (no custody where the officer told the student he was not under arrest).

[12] *See, e.g., B.A.*, 100 N.E.3d at 234 (in custody where the student was taken to juvenile detention center after questioning).

¶24     But courts consider some factors unique to school interrogations. First, courts, of course, consider the age of the student. *See J.D.B.*, 564 U.S. at 280 ("[A] 7-year-old is not a 13-year-old and neither is an adult."). Second, courts consider the role of police versus school administration; the more police officers are present, and the more they play a role in questioning, the more likely a student is in custody. *See B.A. v. State*, 100 N.E.3d 225, 232 (Ind. 2018) (laying out a spectrum with school disciplinary proceedings by school administrators on one end and questioning by armed and uniformed police officers on the other); *id.* at 234 ("[C]onsistent police presence would place considerable coercive pressure on a reasonable student . . . ."); *Matter of D.A.H.*, 857 S.E.2d 771, 781–82 (N.C. Ct. App. 2021) (laying out a similar spectrum). Finally, courts will consider whether parents or other friendly adults were contacted or were in the room. *See, e.g., B.A.*, 100 N.E.3d at 234 (determining a student was in custody where "no one called his mom until after his interview"); *People v. N.A.S.*, 329 P.3d 285, ¶¶2, 13 (Colo. 2014) (no custody where a parent and uncle were in the room).

¶25     We note that the *Miranda* custody analysis remains a totality of the circumstances test, and our list of considerations here is non-exhaustive.

### 3. Application

¶26     Having established the relevant inquiry, we turn to the interrogation here. We conclude that Kevin was in custody for purposes of *Miranda*. We begin by examining the relevant circumstances, and then consider each of our two *Miranda*-custody prongs in turn. Within each prong, we assess the parts of the interrogation within the school resource officer's office and the school-suspension cubicle.

¶27     At the outset, we must bear in mind that Kevin was 12 years old at the time of questioning.[13] He was a middle schooler, in seventh grade, still six years removed from legal adulthood. "[A] reasonable child

---

[13] We consider Kevin's age because his age was "known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer." *See J.D.B.*, 564 U.S. at 277. The school resource officer testified that she knew Kevin was in seventh grade and was likely 12 or 13 years old.

subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go." *J.D.B.*, 564 U.S. at 272. And as compared to adults, children face a higher risk of coercion under interrogation. *See id.* at 269, 272.

¶28 The facts of Kevin's interrogation establish that he was in custody. It started when Kevin was removed from class for questioning, which would likely unsettle a middle schooler. He went to the student services area where he met not with school staff or friendly adults, but with two police officers, one of whom was fully uniformed, armed, and equipped with handcuffs. Both the officers were strangers to him. They questioned him in a small, closet-like room, designated for law enforcement use. For all intents and purposes, this office was the schoolhouse version of a police-station interrogation room. The door was closed. While Kevin sat across from one officer who questioned him, another fully uniformed and armed officer stood positioned in front of the door. The questioning officer asked him about an alleged sexual assault. She told him—untruthfully—that there were witnesses. She also accusingly told him "it happened." No one told him he could reach out to his parents or any other adult. No one told him he was free to leave. No one told him he did not need to answer questions. It is true that the paper sign hung on the wall, the interview was 10 minutes long, the officer spoke to Kevin in a conversational tone from approximately 10 feet away, Kevin was allowed to leave the office after the questions, and he was not handcuffed or frisked. But in the end, a 12-year-old boy was questioned in a closet-like law-enforcement office with two police officers, one who was fully uniformed and standing in front of the door.

¶29 Less than an hour later, the interrogation resumed. We do not know where Kevin went after he left the first interview—we have no evidence that he went back to class or even left the student services area. We do know that within an hour of the first interview, he was seated in a school-suspension cubicle in the student services area, right outside of the school resource officer's office. As Kevin sat in the cubicle, three or four adult authority figures stood around him, including the two officers that had just questioned him and his assistant principal. The assistant principal and an officer asked him pointed questions. They told him what they heard happened. The officer may have raised her voice. We acknowledge that this set of questions was short, the assistant principal did much of the talking, and there was no arrest afterward. Still, a 12-year-old boy had just been questioned by police and was now seated in a school-suspension

cubicle as an assistant principal and police officers stood around him accusing him of a crime.

¶30    Under these circumstances, we must determine whether a reasonable 12-year-old would feel free to leave. *Halverson*, 395 Wis. 2d 385, ¶17; *J.D.B.*, 564 U.S. at 271–72. We conclude a reasonable 12-year-old would not feel free to leave.

¶31    We first consider the part of the interrogation in the school resource officer's office. We would not expect that a child would ask a fully uniformed and armed police officer to step away from the door so that he could leave. This is especially true given that Kevin was questioned by police officers only and in a space designated for law enforcement. *B.A.*, 100 N.E.3d at 232 ("[A]n officer's 'pervasive presence' will probably create custody." (quoted source omitted)); *D.A.H.*, 857 S.E.2d at 782 ("[A]n interview that features heavy [school resource officer] involvement or direction will often qualify as a custodial interrogation."). And other factors point toward a lack of freedom to leave: Kevin was restrained in a small space with a closed door, there were no parents or friendly adults in the room, and no one told him he could leave or refuse to answer questions. The piece of paper on the wall does not change our conclusion. No one acknowledged the paper or explained its message, and the circuit court found it was unclear whether Kevin even saw it. Further, its physical characteristics—handwritten in marker and taped to the wall—undermine its impact. And its language—"you are in here voluntarily unless told otherwise"—might have been confusing to a 12-year-old. In some cases, freedom-to-leave advisements may be weighty, but not in this case.

¶32    To be sure, some factors cut against our conclusion, but considering the totality of the circumstances we are nevertheless convinced that a reasonable 12-year-old would not feel free to leave the office. We recognize that Kevin was not frisked or restrained in handcuffs, but he was nonetheless confined in a small office with an officer in front of the door. We acknowledge that the interview was only 10 minutes long and the tone was conversational, but those facts do not doom a custody determination. *See B.A.*, 100 N.E.3d at 228, 233–34 (holding that an interrogation was "solidly on the 'custody' end of the student-confinement spectrum" even where the interrogation was 15 minutes long and "no one yelled at or threatened" the student). Finally, the fact that Kevin was not taken into custody following the interview is not enough to

change our mind, especially given that he was a 12-year-old in a school setting.

¶33     The interview in the school-suspension cubicle makes our custody determination a closer call, but we conclude that a reasonable 12-year-old would not have felt free to leave. Importantly, this interview occurred within an hour of the previous interview, just outside the school resource officer's office, and with the same officers present.[14] Moreover, as Kevin looked up from his seat, he would have seen three or four adult authority figures standing around him. A reasonable student would not feel free to disobey them by walking away. And after all, Kevin was in a school-suspension cubicle. Students do not feel free to walk out of suspension. *See J.D.B.*, 564 U.S. at 276 ("[D]isobedience at school is cause for disciplinary action . . . ."); *B.A.*, 100 N.E.3d at 232 ("Of course, no student feels free to just walk out of the principal's office . . . .").

¶34     We also conclude that Kevin's interrogation "presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *See Halverson*, 395 Wis. 2d 385, ¶17 (quoting *Howes*, 565 U.S. at 509).

¶35     The questioning in the school resource officer's office was coercive. A student like Kevin would feel pressured after being sent from class to the schoolhouse equivalent of a station house interrogation room. *See Howes*, 565 U.S. at 511 ("In the paradigmatic *Miranda* situation—a person is arrested in his home or on the street and whisked to a police station for questioning—detention represents a sharp and ominous change, and the shock may give rise to coercive pressures."). Moreover, he was in a police-dominated space—a law-enforcement office with two officers inside—and was cut off from classmates, parents, and friendly adults. *See id.* ("A person who is cut off from his normal life and companions and abruptly transported from the street into a police-dominated atmosphere may feel coerced into answering questions." (citation modified)). Finally, the officers used coercive practices by lying about witnesses and asserting his guilt, telling him "it happened." *See Miranda*, 384 U.S. at 450, 453 (worrying about police practices wherein

---

[14] Especially given the lack of clarity in the record regarding where Kevin was between the two interviews, we do not think the less-than-an-hour break in questioning is enough to render Kevin not in custody before or after the break.

interrogators "induce a confession out of trickery" and "[t]he guilt of the subject is . . . posited as a fact").

¶36     This coercion continued in the school-suspension cubicle. This set of questioning took place within an hour of the prior interview, within the same student services center, with the same officers present as before. Moreover, whereas the first set of questions was more conversational, this one was more accusatory. A police officer may have raised her voice at Kevin. The questions were more direct. The authority figures told Kevin what they had heard about the incident. *See Miranda*, 384 U.S. at 450 ("The guilt of the subject is to be posited as a fact."). On top of all of this, Kevin was 12 years old. And children are more vulnerable to coercion than adults. *J.D.B.*, 564 U.S. at 272 ("[E]vents that 'would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens.'" (quoting *Haley*, 332 U.S. at 599)).[15]

¶37     We hold that Kevin was in custody for purposes of *Miranda* when police interrogated him in the school resource officer's office and the school-suspension cubicle. He was never given *Miranda* warnings. Thus, the circuit court should have granted his suppression motion, and his statements under custodial interrogation should have been excluded at trial. But as we explain next, admitting his statements was harmless error.

## B. HARMLESS ERROR

¶38     Our statutes counsel that criminal judgements shall not be affected by errors "which do not prejudice the defendant." WIS. STAT.

---

[15] The concurrence suggests that schoolhouse questionings like Kevin's do not rise to constitutional importance under *Miranda*. *See* concurrence, ¶47. We disagree. We think the Constitution contemplates cases like this, where children are put in coercive situations with law enforcement present and juvenile offenses on the line, even when those interactions happen at school. Like the Supreme Court in *J.D.B.*—a case the concurrence largely ignores—we take seriously the heightened risks when interrogating children, on top of the already "inherently compelling pressures" of custodial police interrogation. *See J.D.B.*, 564 U.S. at 269 (quoting *Miranda*, 384 U.S. at 467). Moreover, the concurrence's narrow view of *Miranda*'s protections in the schoolhouse cannot be squared with cases across the country holding that students are in *Miranda* custody when questioned at school. *See, e.g., B.A.*, 100 N.E.3d at 233–34; *N.C.*, 396 S.W.3d at 862; *Matter of D.A.H.*, 857 S.E.2d 771, 786–87 (N.C. Ct. App. 2021); *M.A.K.*, 667 N.W.2d at 472.

§ 971.26. Considering harmless error furthers "the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence." *State v. Nelson*, 2014 WI 70, ¶42, 355 Wis. 2d 722, 849 N.W.2d 317 (quoting a source, in turn quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)). An error is harmless if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *State v. Dobbs*, 2020 WI 64, ¶68, 392 Wis. 2d 505, 945 N.W.2d 609 (quoting another source). We conclude the admission of Kevin's statements under custodial interrogation was harmless.

¶39 As an initial matter, the parties dispute whether the State forfeited this issue. Forfeiture is the failure to assert a right in a timely manner. *State v. Ndina*, 2009 WI 21, ¶¶29–30, 315 Wis. 2d 653, 761 N.W.2d 612. Kevin argues that the State forfeited this issue because the State first made its harmless error argument in its response brief in front of this court, despite Kevin raising the issue earlier in the litigation.

¶40 Though we acknowledge that our review would benefit from the State raising or responding to the issue sooner, we reach the issue nonetheless. We have said the harmless error rule "is an injunction on the courts, which, if applicable, the courts are required to address regardless of whether the parties do." *State v. Harvey*, 2002 WI 93, ¶47 n.12, 254 Wis. 2d 442, 647 N.W.2d 189. And ultimately, "the forfeiture rule is a rule of judicial administration, not a mandate." *State v. Coffee*, 2020 WI 1, ¶21, 389 Wis. 2d 627, 937 N.W.2d 579. Accordingly, we consider whether harmless error applies here.

¶41 A reasonable factfinder would have found that the State proved all the elements of Fourth Degree Sexual Assault even without Kevin's inadmissible statements. The court erred in admitting Kevin's statements that he "might have accidently touched" the victim. The value to the circuit court of those statements, if any, would have been that Kevin admitted the contact occurred. But that evidence already came in through the assistant principal. The assistant principal testified that he talked to Kevin without law enforcement present and Kevin said there was a "tap" or a "hit." Moreover, Kevin's statement was not necessary to a finding of intent. Indeed, Kevin's statement suggests the touching was accidental, while the circuit court heard other evidence that it was intentional. The victim testified that he thought Kevin touched him intentionally, and provided details to support that conclusion: Kevin angled toward the victim with his hand out; Kevin cupped his hand; Kevin was not swinging

his arms or messing around in a way that could have led to an accidental hit; and Kevin did not say "oops" or otherwise apologize for the contact. Finally, the State did not mention Kevin's statements under custodial interrogation in its closing.

¶42     In sum, the school resource officer's testimony about Kevin's statements was duplicative of other testimony, unnecessary for a finding of intent, and went unmentioned during the State's closing. We conclude that, beyond a reasonable doubt, a rational factfinder would have found Kevin delinquent even without his statements while under *Miranda* custody.

## III.  CONCLUSION

¶43     The circuit court erred in admitting Kevin's statements to law enforcement. Kevin was never Mirandized, and he was under custodial interrogation for purposes of *Miranda* when he made statements to law enforcement. Nevertheless, the circuit court's error was harmless. We therefore affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

BRIAN K. HAGEDORN, J., with whom ANNETTE KINGSLAND ZIEGLER and REBECCA GRASSL BRADLEY, JJ., join, concurring.

¶44    One day while walking into class, a 12-year-old student we will refer to as Kevin made contact with a male classmate's groin. The next day, a school administrator called Kevin out of class to meet with a School Resource Officer (SRO)—a law enforcement officer assigned to work in a school. What ensued was a ten-minute conversation with the SRO and an SRO-in-training, followed by a substantial break, and concluding with a second interview involving the vice principal lasting two to three minutes. During the questioning, Kevin admitted he touched his classmate, but he said it was an accident. He was later adjudicated delinquent for his actions.

¶45    Before us, Kevin contends the evidence from his interviews should be suppressed because he was not given *Miranda* warnings prior to questioning. Both the circuit court and court of appeals disagreed. The majority now holds the opposite. It says all these events—the SRO questioning, the break, and the short follow-up with the vice principal—constitute one interrogation. It concludes that Kevin was "in custody" for purposes of *Miranda* during this interrogation and should have received the warnings. Because no warnings were given, the remedy is excluding the evidence. The majority affirms the court of appeals, however, because it finds the *Miranda* violation harmless.

¶46    I would affirm the court of appeals as well, but for different reasons. Kevin was not entitled to *Miranda* warnings prior to questioning because this encounter was not a "custodial" interrogation as defined by *Miranda* and its progeny. Even if Kevin was not free to leave, this brief, fragmented questioning during the school day did not approximate the kind of prolonged, inherently coercive police station questioning to which *Miranda*'s prophylactic rules apply.

¶47    In my view, the majority's contrary view misses the forest for the trees, erroneously transforming a rather ordinary schoolhouse questioning (on a serious offense, to be sure) into a matter of constitutional moment. The majority overemphasizes the freedom to leave inquiry, and offers little analysis on the critical question of how this interrogation compares to the station house questioning in *Miranda*. The Supreme Court has made clear "that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010). To be sure, the

*Miranda* framework can be challenging to apply. It is even harder when the suspect is a minor, with one commentator opining that court rulings on these matters "appear to be utterly irreconcilable."[1] Even so, Kevin's situation is not analogous to the coercive pressures that motivated the Court in *Miranda*. And while a trip to the office may cause an ordinary 12-year-old student to sweat, these run of the mill schoolhouse fears do not—at least under the facts here—require that the student be warned of his constitutional rights first. I respectfully concur.

## I. BACKGROUND

¶48    Near the end of the 2022 school year, Kevin—who was 12 years old and in seventh grade—made contact with a male classmate's groin while he walked into class. His classmate immediately told the teacher, who then sent Kevin down to the assistant principal's office. The victim's parents called the school and asked for a police report to be filed. That led to Kevin's questioning in this case and eventually the juvenile delinquency proceeding described more fully by the majority.[2]

¶49    The day after Kevin touched the victim, a school administrator called Kevin from class to talk with the SRO. School Resource Officer Briana Propson was covering for the normal middle school SRO that day. She asked Kevin to come into her office, which was located directly adjacent to the student services office and connected via door.

¶50    Kevin voluntarily entered the SRO's office; it was small and tight. Kevin sat back in his chair, arms crossed in his lap, one foot forward, one foot back, in a comfortable or relaxed position. The office had a handwritten sign on standard 8 x 11 paper that said, "You Are in Here Voluntarily Unless Told Otherwise. You are Being Filmed And Can Leave at Any Time!" The sign was at eye level with Kevin, positioned to his right just a foot away from him. No reference was made to this sign during the interview. In addition to Officer Propson, a new officer-in-training, Officer Tobison, was present for the interview. Officer Tobison—who did not

---

[1] Paul Marcus, *The Miranda Custody Requirement and Juveniles*, 85 TENN. L. REV. 251, 287 (2017).

[2] Majority op., ¶¶10–13.

speak during the questioning—was wearing a full police uniform and stood in front of the door. Officer Propson was wearing a police vest with ordinary civilian clothes.

¶51 The door was closed during the meeting so the students in the adjacent office didn't overhear. Officer Propson engaged in conversational, largely open-ended questioning with Kevin for about 10 minutes. No one raised their voice. Officer Propson did not pound her fists on the table or anything similar, nor did she engage in behavior that could be considered aggressive. She sat across the desk from Kevin, maybe 10 feet away.[3] At the beginning of the interview, Officer Propson introduced herself, mentioned the allegations, and asked Kevin what happened. Kevin admitted that he had touched the victim, but said it was an accident. Sometime soon after this, Officer Propson told Kevin that someone had witnessed him grabbing the victim's groin. She was, however, unaware of any such witnesses. At one point, Officer Propson stated "it happened." During the interview, Kevin did not ask for his parents or indicate that he didn't want to talk with Officer Propson. At one point during the interview, a school staff member knocked on the door to confirm Kevin had arrived. After the brief conversation ended, Kevin was told he was free to leave, and he did so.

¶52 The record does not reflect exactly where Kevin went at this point, but we know he was no longer with or under the supervision or control of law enforcement. And this break may have lasted close to an hour.

¶53 Kevin then came back for an even shorter second interview, this time in the much larger student services office. Along with Officers Propson and Tobison, the interview included the school's vice principal and possibly a second administrator. Kevin was sitting in a cubicle students use for in-school suspension, and the vice principal and Officer Propson were standing nearby. This time, the questions came mostly from

---

[3] The majority describes the SRO's office as "a small, closet-like room" and finds this important to its analysis. Majority op., ¶28. The record does say the room was very small and "kind of like a closet." But the room also had space for a desk and two chairs such that Officer Propson and Kevin were 10 feet apart while sitting across from each other. Therefore, while it may have been a small office, it appears it would have been a sizable walk-in closet.

the vice principal and were less open-ended and more direct. The interview was very short, lasting maybe two or three minutes. Officer Propson herself asked only a couple more questions, and she indicated that it could have come across as if she raised her voice. In the face of these questions, Kevin again stated he "did it by accident." Once again, Kevin never asked for his parents or indicated that he did not want to talk. When this interview ended, Kevin was not arrested or otherwise placed in custody. He returned to the remainder of his school day, which Officer Propson recalled as staying to serve an in-school suspension.

## II.  DISCUSSION

### A.  THE LAW OF MIRANDA

¶54     Kevin argues that his statements during questioning should be suppressed because he was not given *Miranda* warnings. The issue central to that assertion is whether Kevin was "in custody" for purposes of *Miranda* during his interrogation.

¶55     The Fifth Amendment to the United States Constitution provides, "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. *Miranda* preemptively protects against violations of this right by instructing that when the "procedural safeguards" are not given, statements from a "custodial interrogation" may not be used in court. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Those safeguards include giving the well-known warnings that the defendant "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* Thus, *Miranda* establishes a set of "prophylactic" rules and "rests on a pragmatic judgment about what is needed" to protect against violations of the right against compelled self-incrimination. *Vega v. Tekoh*, 597 U.S. 134, 151 (2022).

¶56     As we have explained, the "anti-coercion objective is central to understanding the reach and limits of the *Miranda* requirements." *State v. Halverson*, 2021 WI 7, ¶15, 395 Wis. 2d 385, 953 N.W.2d 847. This is especially true in determining whether an interrogation by law enforcement is "custodial." *See id.* In the context of *Miranda*, "'custody' is a term of art." *Howes v. Fields*, 565 U.S. 499, 508 (2012). It is an objective inquiry and involves two steps. *Id.* at 509.

¶57　First, in view of the totality of the circumstances, would a reasonable person have felt "at liberty to terminate the interrogation and leave"? *Id.* (citation modified). Relevant factors include where the questioning took place, its length, whether the interviewee was restrained, whether he was released at the end of the questioning, and the statements that were made. *Id.* While still an objective inquiry, the interviewee's age should be considered in a reasonable person determination. *J.D.B. v. North Carolina*, 564 U.S. 261, 271–77 (2011). This means we must inquire whether a reasonable 12-year-old in the same circumstances as Kevin would have felt free to terminate the interrogation and leave. Critically, however, the first question is not the end of the matter. It is a necessary condition for *Miranda* custody, but not sufficient. *Id.* at 270.

¶58　The second step asks "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509. The Court has elsewhere described the "ultimate inquiry" as whether the interviewee was formally or functionally arrested. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Given this test, we must explore those inherently coercive station house circumstances to properly analyze whether Kevin's brief encounter carried the same dangers.

¶59　*Miranda* involved four consolidated cases. 384 U.S. at 440. In each, the defendant was "in a room in which he was cut off from the outside world" in what the Court described as a "police-dominated atmosphere." *Id.* at 445. The Court described the danger and reality associated with incommunicado interrogation, including the danger of police brutality. *Id.* at 446. It also warned of psychological coercion whereby officers, through "patience and persistence" and "relentless questioning" erode the will of the accused. *Id.* at 455. Through lengthy interrogations "with no respite from the atmosphere of domination," the accused can be worn down over time. *Id.* at 451. The interrogators may also use hostility, trickery, and other such tactics "to keep the subject off balance, for example, by trading on his insecurity about himself or his surroundings." *Id.* at 455.

¶60　The Court took pains to explain that it was concerned "primarily with this interrogation atmosphere and the evils it can bring." *Id.* at 456. "In each of the cases, the defendant was thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures" where the "potentiality for compulsion is forcefully apparent." *Id.* at 457. Again, the Court emphasized that the prophylactic

measures it prescribed were designed to apply when a person is "swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion" it previously described. *Id.* at 461. In these circumstances, the person "cannot be otherwise than under compulsion to speak." *Id.*

¶61 This background is essential, because the court has said that this same police-dominated atmosphere is the *sine qua non* of *Miranda* custody. *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). "*Miranda* is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.'" *Shatzer*, 559 U.S. at 112–13 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984)). The Court has summarized the concerns that give rise to a custody environment as follows:

> Custodial arrest is said to convey to the suspect a message that he has no choice but to submit to the officers' will and to confess. . . . Moreover, custodial arrest thrusts an individual into "an unfamiliar atmosphere" or "an interrogation environment . . . created for no purpose other than to subjugate the individual to the will of his examiner." Many of the psychological ploys discussed in *Miranda* capitalize on the suspect's unfamiliarity with the officers and the environment. . . . Finally, the coercion inherent in custodial interrogation derives in large measure from an interrogator's insinuations that the interrogation will continue until a confession is obtained . . . [*Miranda* considers] the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator.

*Minnesota v. Murphy*, 465 U.S. 420, 433 (1984) (quoting *Miranda*, 384 U.S. at 456–57) (citation modified) (second omission in original).

¶62 It is certainly true that any police interview carries a sense of force such that one might feel pressured to communicate information, even information the interviewee does not initially wish to share. *See J.D.B.*, 564 U.S. at 269. But *Miranda* is concerned not with these ordinary police interactions; it is aimed only at the environments like those described in *Miranda* where the risk is intolerably high "that the statements obtained are not the product of the suspect's free choice." *Id.* at 268–69. Two Supreme Court cases illustrate the point further.

¶63    In *Berkemer v. McCarty*, the Supreme Court was asked whether a person must be read their rights before being questioned in a routine traffic stop—and more specifically, whether a traffic stop constituted "custodial interrogation" under *Miranda*. 468 U.S. at 435. The Court quickly observed the obvious: someone pulled over by law enforcement is not free to leave. *Id.* at 436. The first step in the analysis was certainly satisfied. But the court concluded no *Miranda* warnings are necessary in a routine traffic stop because it does not present the same coercive pressures *Miranda*'s prophylaxis was designed for. *Id.* at 438–39. The Court noted that traffic stops are usually brief, not the kind of "prolonged" interrogation "in which the detainee often is aware questioning will continue until he provides his interrogators the answers they seek." *Id*. at 437–38. And drivers who have been pulled over do not typically feel "completely at the mercy of the police." *Id.* at 438. Sure, there is "pressure on the detainee to respond to questions." *Id.* On the other hand, the public nature of the encounter—usually with only one or two policemen present—"reduces the ability of an unscrupulous policemen to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse." *Id.* Like a *Terry* stop, the detention is typically brief and "comparatively nonthreatening." *Id.* at 439–40. In short, a traffic stop is not a police-dominated atmosphere; it does not raise the same kind of coercive risks that animated the court in *Miranda*. *Id.*

¶64    In *Howes*, Supreme Court faced the question of whether an imprisoned individual is—by virtue of his confinement—in custody for purposes of *Miranda*. The Court answered no. *Howes,* 565 U.S. at 508. The Court's rationale is on point here. "First, questioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest." *Id.* at 511. The Court contrasted the jailhouse suspect from "the paradigmatic *Miranda* situation," where a defendant had been "whisked to a police station." *Id.* Such arrest and whisking is a sudden departure from the suspect's normal daily life and a person who is "abruptly transported from the street into a police-dominated atmosphere, may feel coerced into answering questions" due to the "shock." *Id.* (citation modified). Second, a jailhouse prisoner does not have the same desire for a quick release from custody that gives rise to coercive pressures. *Id.* "When a person is arrested and taken to a station house for interrogation, the person who is questioned may be pressured to speak by the hope that, after doing so, he will be allowed to leave and go

7

home." *Id.* For those already confined, however, such a hope is not present. *Id.*[4]

¶65    Finding that a suspect is not free to leave, then, is merely an initial, necessary step. Courts must still answer the ultimate question of whether the pressures of the situation exhibit the same type of police-dominated atmosphere that concerned the Court in *Miranda*.

## B.  APPLICATION

¶66    Applying this to the case at hand, we must first determine whether a reasonable person in Kevin's position would have felt free to end the interview and leave. *Id.* at 509. The majority spends considerable time contending that a reasonable 12-year-old in the same situation would not have felt free to leave. On one level, that is reasonable, and I need not spend much time disputing it. However, that conclusion here is odd because, during the middle of this two-part interview, *he did leave* at the officer's invitation. I am unaware of any *Miranda* cases where the suspect is told he is free to go, then leaves, and yet is still determined to be in custody. Given the majority's analysis treating this as one continuous interrogation, the fact that Kevin did leave when told he could is pretty sound evidence that he was not functionally under arrest. The majority marshals no authority for this unusual situation either.

¶67    In any event, much like a traffic stop or the prison context, the freedom to leave analysis is not particularly helpful to the determination of whether Kevin was in custody. During the school day, a student's freedom is always limited and subject to the direction of adults in whose care they have been entrusted. It wouldn't matter whether the adult giving direction is a principal, teacher, coach, instructional aide, or SRO. Thus, although I question the conclusion that a reasonable person in Kevin's position would not have felt free to leave the questioning by the SRO (given that Kevin was afforded the opportunity to depart, and did so), this prerequisite—even if satisfied—is of little assistance in answering the main question.

---

[4] Less relevant here, the Court also reasoned that a suspect already serving his sentence would not be under the misapprehension that his questioners could affect his sentence. *Howes v. Fields,* 565 U.S. 499, 512 (2012).

¶68   Turning to the ultimate question, for an interrogation to be custodial for purposes of *Miranda*, the circumstances of Kevin's questioning must be akin to the police-dominated atmosphere that *Miranda*'s prophylactic procedures were designed to guard against. As the following analysis spells out, would a reasonable 12-year-old in this situation feel some pressure? Absolutely. But was this the kind of hostile, inherently coercive questioning that animated the court in *Miranda*? It was not.

¶69   As a general rule, in contrast to the police station, "courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings." *See* LaFave *et al.,* 2 Crim. Proc. § 6.6(e) (4th ed. 2025) (collecting cases). The location of this questioning in school is key. Kevin was not "whisked" to the police station where the sudden "shock" might overwhelm him. *Howes,* 565 U.S. at 511. Kevin was directed to meet with an SRO. Kevin was first questioned in a room connected to the student services office where in-school suspensions were served. There were even students in the room connected to where this questioning occurred. And he was called there by a school administrator, rather than law enforcement. The second interview occurred in the familiar student services office; it included and was primarily led by the vice principal. Kevin was not alone with police in a police office.

¶70   Kevin's school had a permanent SRO with a dedicated office. A reasonable person in Kevin's position would not see SROs as unfamiliar and antagonistic adults. The reasonable person would see them as dedicated and familiar faces—intimidating to be sure—but nonetheless present to keep everyone safe. They are at least in a different category than unfamiliar police officers conducting an arrest on the street. The eponymous "bad cop" that the court discussed in *Miranda* was out to get a confession using all means of pressure, whereas an SRO is reasonably viewed as a valued member of the school community. Meeting with an SRO in school, then, is not ordinarily the kind of domineering police interaction designed to cause the kind of psychological shock that concerned the court in *Miranda*.

¶71   There's nothing in the record to suggest that L.B. Clarke Middle School in Two Rivers, Wisconsin was filled with "antagonistic forces" ready to bend students to their will by any means necessary. Nor is there any reason to think that Kevin was uniquely placed among such antagonistic forces. He was surrounded by trusted non-police adults in a

supportive school atmosphere—unlike the police-dominated station house questioning in *Miranda*.

¶72    In addition, *Howes* based its decision in part on the fact that a prisoner is less likely to feel coerced to confess so he can be released to normal life because he has no immediate freedom to return to. So too in a school environment. A student would simply go back to his day at school where he is still subject to the oversight and direction of other adults charged with supervising him. At some point, the school day ends; all of us have impatiently watched the clock knowing that school will soon be over. So would a reasonable person in Kevin's position. He would not think he will be stuck in the SRO's office until he confesses, however long that might be.

¶73    Likewise, this entire officer-involved investigation was extremely brief. The initial interview with the officers was just 10 minutes, followed by a substantial break where Kevin was free from police supervision, followed by a two to three minute session led by the vice principal. In no way was this a set of interviews that can be described as "relentless questioning" "with no respite from the atmosphere of domination." *Miranda*, 384 U.S. at 451, 455. Kevin was not subject to an environment marked by psychological trickery designed to wear him down over time. Quite the contrary, the main interview—and the only one conducted alone with law enforcement—was conversational, with no one raising their voice, and no aggressive tactics or fist-pounding.

¶74    And although nobody explicitly mentioned it, the SRO's office contained a sign a foot away from Kevin at his eye level informing him that he did not need to be there and could leave at any time. This may not weigh heavily in the analysis, but it is an additional datapoint suggesting this was not a police-dominated atmosphere where the student would be held until he confessed.

¶75    Even though there were two officers in the room, the second officer was in training and did not participate in the interrogation, which minimized the impact of his presence. He may have been standing in front of the door, but there is no sense in the record that a reasonable 12-year-old would interpret this as a show of force or restraint. The room was, according to the testimony, quite small. Kevin was not physically restrained, handcuffed, or frisked, nor were there any markers of arrest. Kevin was not cut off from the outside world. He sat comfortably in the SRO's office. Within the first 10 minutes of questioning, a school

administrator even made sure he arrived at the SRO's office. And Kevin left after the first questioning for up to an hour—hardly the marker of being in custody. Following the interview, he was set free for school activities; he was not taken into custody or arrested. In short, the typical marks of functional arrest are simply not present.

¶76 The majority sees things differently. And given the contradictory cases on these questions, its decision presents a reasonable countervailing view. Even the court of appeals described this as a close case. The majority correctly points to some facts that make this case more difficult. Officer Propson lied about there being a witness to the event, at one moment pointedly asserting "it happened." Perhaps she raised her voice during the second brief encounter that included school administration. And Kevin was brought back for ongoing questioning after he had been initially allowed to leave. One of the officers was fully uniformed, including with his weapons. At no point were Kevin's parents, presumably the friendliest adults available, mentioned by anybody. These facts give some support to the idea that a reasonable person in Kevin's situation would have felt pressured to confess.

¶77 Under my read of the cases, however, more is required to approximate the coercive environment at issue in *Miranda*. Someone in Kevin's shoes would certainly feel the weight of adult condemnation. His conscience might even call him to come clean in the face of a serious infraction. But this normal human experience should not so quickly be placed on par with the uniquely coercive station house questioning to which *Miranda* applies. The majority places inordinate weight on the vulnerability of children in this atmosphere. But the Supreme Court has explained that the Fifth Amendment's privilege against self-incrimination "is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)). Rather, "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." *Id.* In the context of *Miranda* itself, it is *police* coercion that the prophylaxis is designed to guard against. And we simply do not have that kind of environment here.

¶78 In the end, this was a brief, non-coercive interview in a safe and familiar location. A reasonable person in Kevin's position would have been nervous, scared, and concerned about the consequences that might follow. He would certainly feel pressure to talk to an officer, just like a student would on a trip to the principal's office. But the environment

Kevin faced was not the police-dominated inherently coercive atmosphere to which *Miranda*'s procedural safeguards apply. *Berkemer*, 468 U.S. at 437 ("[*Miranda* should be strictly enforced] only in those types of situations in which the concerns that powered the decision are implicated."). Whereas *Miranda* was worried about a defendant being "thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures," Kevin was in a familiar place with familiar people where he was subject to conversational questioning, even if somewhat pointed at times.[5] Whereas *Miranda* was worried about an environment "created for no purpose other than to subjugate the individual to the will of his examiner," this was an extremely short set of fragmented interviews during a school day conducted by the school officer and administration.[6] The persistent interrogator in *Miranda* can exercise complete dominion over the suspect until he gets his confession. Only then will the interview end. A reasonable person in Kevin's situation, however, knows he can be saved by the bell; the school day does not last forever. He was already given permission to leave one short interview, so a reasonable person would think he would be allowed to leave again.

¶79 I conclude that the implicit coercive pressures that motivated the *Miranda* decision are not present in this case. Kevin was not in custody. Therefore, he was not subject to a custodial interrogation, which means the prophylactic *Miranda* warnings were not necessary. Consequently, there is no *Miranda* violation and no confession to suppress.[7]

III.  CONCLUSION

¶80 The majority concludes that Kevin was subjected to the same inherently coercive pressures as the station house in *Miranda*. I disagree;

---

[5] *Miranda v. Arizona*, 384 U.S. 436, 457 (1966).

[6] *Id.*

[7] Kevin also argues his statements were not voluntary. I agree with the analysis from the court of appeals rejecting this argument and see no need to repeat it here. *See State v. K.R.C.*, No. 2023AP2102, unpublished slip op., ¶¶27–34 (Wis. Ct. App. Oct. 30, 2024) (explaining due process voluntariness standards and why Kevin's statements were voluntary).

the prophylactic rule from *Miranda* does not apply to Kevin because he was not subject to a custodial interrogation. I would affirm the court of appeals on that basis, rather than the majority's conclusion that it was harmless error to admit Kevin's statements at trial. For these reasons, I respectfully concur.